## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| **KEVIN M. LOUGHMAN** ) | |
| **Petitioner,** ) | |
| ) | |
| **v.** ) | **Civil Action No. 05-10374-RCL** |
| ) | |
| **STEVEN O'BRIEN** ) | |
| **Respondent.** ) | |

## RESPONDENT'S MEMORANDUM OF LAW
## IN SUPPORT OF HIS MOTION TO DISMISS

The respondent, Steven J. O'Brien, respectfully submits this memorandum of law in support of his motion to dismiss the petition for a writ of habeas corpus filed by the petitioner, Kevin M. Loughman.  The petition should be dismissed as a mixed petition because Loughman never presented the claim in ground three to Massachusetts's highest court.  Relief cannot be granted on a habeas petition containing a claim that was not fairly presented to the Commonwealth's highest tribunal.  28 U.S.C. § 2254(b)(1).  Consequently, unless Loughman elects to voluntarily delete ground three from his petition, his petition must be dismissed in its entirety, or denied on the merits.  *Rose v. Lundy*, 455 U.S. 509, 522 (1982); 28 U.S.C. § 2254(b)(1).___

## PRIOR PROCEEDINGS

On August 17, 2000, a Hampden County grand jury returned indictments charging the petitioner with two counts of rape and one count of assault and battery.  *See* Respondent's Supplemental Answer ("RSA"), Ex. 1.  On April 2, 2002, after a jury trial before Massachusetts Superior Court Associate Justice Daniel A. Ford, the petitioner was found not guilty of one count of rape and  was convicted of the remaining charges.  *Id.*  Judge Ford sentenced the petitioner to

a state prison term of a minimum of five years and a maximum of seven years for the rape conviction, along with a concurrent term of two and one- half years for assault and battery. *Id*. The petitioner timely appealed. *Id*.

In his appeal to the Massachusetts Appeals Court, the petitioner claimed that (1) his convictions must be reversed because the trial judge created a substantial risk of a miscarriage of justice by giving erroneous jury instructions in response to the jury's impasse in reaching a verdict on the charge of rape alleged in count two and/or because of the failure of the petitioner's trial counsel to object to said jury instructions constituted ineffective assistance of counsel under the Sixth and Fourteenth Amendments to the United States Constitution; (2) his convictions must be reversed because the trial judge created a substantial risk of a miscarriage of justice by instructing the jury as to fresh complaint evidence in a manner that indicated to the jury that the alleged fresh complaint had indeed been stated by the victim to the fresh complaint witness and/or because the failure of the petitioner's trial counsel to object to said jury instructions constituted ineffective assistance of counsel under the Sixth and Fourteenth Amendments to the United States Constitution; (3) the trial judge committed reversible error by admitting the testimony of Chicopee Police Officer Holly Davis in which Officer Davis improperly vouched for the credibility of the victim; (4) his convictions should be reversed because of prosecutorial misconduct regarding the petitioner's tattoos; (5) the trial judge committed reversible error by admitting as an exhibit for identification a clear plastic bag containing letters purportedly sent by the petitioner to the victim. *See* RSA, Brief for the Appellant at pp. 1-2. On June 28, 2004, in an unpublished memorandum and order pursuant to rule 1:28, the Massachusetts Appeals Court

affirmed the petitioner's convictions.  *See* RSA, *Commonwealth v. Loughman*, 61 Mass.App.Ct.1114, 810 N.E.2d 1289 (2004).

The petitioner filed an application for leave to obtain further appellate review in the Massachusetts Supreme Judicial Court ("SJC"), asserting the following claims: (1) his convictions must be reversed because the trial judge created a substantial risk of a miscarriage of justice by giving erroneous jury instructions in response to the jury's impasse in reaching a verdict on the charge of rape alleged in count two and/or because of the failure of the petitioner's trial counsel to object to said jury instructions constituted ineffective assistance of counsel under the Sixth and Fourteenth Amendments to the United States Constitution; (2) his convictions must be reversed because the trial judge created a substantial risk of a miscarriage of justice by instructing the jury as to fresh complaint evidence in a manner that indicated to the jury that the alleged fresh complaint had indeed been stated by the victim to the fresh complaint witness and/or because the failure of the petitioner's trial counsel to object to said jury instructions constituted ineffective assistance of counsel under the Sixth and Fourteenth Amendments to the United States Constitution; and (3)  his convictions should be reversed because of prosecutorial misconduct regarding the petitioner's tattoos. *See* RSA, Petitioner's ALOFAR.  On September 10, 2004, the SJC denied the petitioner's ALOFAR.  *See Commonwealth v. Loughman*, 442 Mass. 1108, 815 N.E.2d 1084 (2004).

On February 11, 2005, the petitioner filed the instant petition for habeas corpus claiming (1) denial of effective assistance of counsel; (2) prosecutorial misconduct; (3) violation of Article six... right to impartial jury; and (4) violation of due process right under the Fourteenth Amendment where an improper instruction relative to the use of fresh complaint evidence

3

prejudiced the jury. *See* Petition at ¶ 12.   On October 11, 2005, the petitioner filed a more

definite statement, relying on his brief in the SJC. *See* Docker at 18.   On December 27, 2005, the

respondent filed an answer and supplemental answer. *See* Docket. On March 7, 2007, this court

entered an order directing the respondent to file a response to the habeas petition on or before

March 30, 2007.   The respondent now files this memorandum of law in support of his motion to

dismiss the petition as unexhausted.

## STATEMENT OF THE FACTS

### A.     **The Commonwealth's Case**.

The victim[1] met the petitioner in April, 1998, when she was seventeen years old and he

was twenty-eight. *See* Tr.I/111, 114.[2]   The petitioner was a member of band call Skin Dog's

Army. *See* Tr.I/110.   The victim and petitioner met at one of his concerts, and the two began

dating in May, 1998. *See* Tr.I/110.   Soon after, the victim left her home in New Hampshire and

moved into the petitioner's home in Monson. *See* Tr.I/111-112.

At the petitioner's suggestion, the couple engaged in different kinds of sexual

experimentation. *See* Tr.I/115, 117.   The petitioner introduced the victim to bondage, whips,

and sexual apparatus during their sexual encounters. *See* Tr.I/115-116.   He also inflicted pain on

the victim through spanking and whips. *See* Tr.I/117, 215-16.   The victim loved the petitioner

and accepted the petitioner's sexual appetites. *See* Tr.I/117, 118, 127.   At the petitioner's

suggestion and urging, the victim began to work as an exotic dancer at a local adult entertainment

establishment. *See* Tr.I/118-20.   Through her employment, the victim worked at stag parties and

---

[1] The respondent has avoided using the victim's name.

[2] The respondent cites to the trial transcript as Tr. Volume/page number.

simulated various sexual acts for the audience. *See* Tr.I/207-209. The victim testified that she willingly participated in the sexual experimentation and that she enjoyed the activities to a certain extent. *See* Tr.I/117.

After a little over a year, the relationship became rocky, and the couple broke up. *See* Tr.I/118. While both the victim and the petitioner went on to date other people, they remained friends. *See* Tr.I/126-127. The victim continued to love the petitioner despite their problems, and the two maintained an amicable relationship. *See* Tr.I/127. The petitioner wrote hundreds of letters to the victim, up to one or two per day, including poetry. *See* Tr.I/128. The petitioner wrote letters on any kind of paper he could find, including cocktail napkins. *Id.* The victim kept all of the petitioner's letters and enjoyed receiving the letters. *Id.* The victim likewise wrote letters to the petitioner. *See* Tr.I/233-234.

In the months following their breakup, the victim and the petitioner maintained regular contact, and had a sexual encounter on New Year's Eve, 2000. *See* Tr.I/126-27, 129, 132. The couple did not resume their dating relationship following this encounter, but maintained a friendship. *See* Tr.I/132. The victim visited the petitioner at his home, and wrote him letters expressing her affection.

On June 19, 2000, the victim was at the apartment she shared with a roommate, Amy Dube. *See* Tr.I/147. Ms. Dube was pregnant and intended to leave the apartment in order to move in with her mother. *See* Tr.I/148. Consequently, the victim was also moving out of the apartment, which she could not afford alone. *Id.* At some point during the day, the victim spoke to the petitioner by telephone. *See* Tr.I/149. On the same evening, the petitioner arrived to visit the victim while she was packing her things. *See* Tr.I/150, 151. The petitioner brought a twelve-

5

pack of beer to the victim's apartment. *See* Tr.I/152. The two spent a pleasant evening together. *See* Tr.I/153. Several of the victim's friends stopped by the apartment, and the petitioner continued to drink beer. *See* Tr.I/153-57. The victim recognized that the petitioner was getting drunk. *See* Tr.I/157.

At approximately 1:00 a.m., the victim and the petitioner took her dog for a walk and talked about the petitioner's upcoming move to Wisconsin. *See* Tr.I/157-58. The victim did not want to move to Wisconsin, and did not plan to accompany the petitioner. *See* Tr.I/159. After the walk, the two returned to the petitioner's apartment, where the victim cooked a pizza. *See* Tr.I/160-161. The petitioner than noticed that the victim had not opened three of the letters that he had sent her. *See* Tr.I/162-63. At that point, according to the victim, "it's like a trigger snapped." *See* Tr.I/164.

The petitioner began to scream at the victim, and threw her down on the bed. *See* Tr.I/163-64. The petitioner placed his hands on the victim's neck and began to choke her. *See* Tr.I/164. The petitioner bit the victim on the forehead, threw her into a wall, and again threw her onto the bed. *See* Tr.I/164. As the victim tried to escape, the petitioner slapped her buttocks and back with his open hand, leaving a mark. *See* Tr.I/165-66. He dragged the victim around the room, screaming at her about "certain things, past things, in a rage." *See* Tr.I/166. The petitioner then threatened to commit suicide and attempted to cut his wrists with two kitchen knives. *See* Tr.I/166-171. The knives were too dull, and his attempts were unsuccessful, although he did draw blood on one wrist. *See* Tr.I/167, 245-246. The petitioner tore off the victim's pajamas, paced the bedroom, and read the unopened letters aloud to the victim. *See* Tr.I/175. The victim was crying and finally dozed off. *See* Tr.I/176.

The victim awoke to find the petitioner on top of her, screaming at her once again, penetrating her vagina with his penis. *See* Tr.I/178. As the petitioner removed his penis from the victim's vagina and inserted it into her mouth, he stated, "I'm not going to get it this way, I'll get it that way." *See* Tr.I/179-80. The petitioner did not remove his penis from the victim's mouth until she choked. *See* Tr.I/180. The petitioner remained angry and continued to scream at the victim throughout this encounter. *See* Tr.I/180-81.

The victim convinced the petitioner to leave her apartment by telling him that her roommate would be returning to the apartment. *See* Tr.I/181. The petitioner called his roommate for a ride. *See* Tr.I/182-184. As the petitioner waited for his ride to arrive, he apologized to the victim. *See* Tr.I/183. When his roommate arrived, he asked the victim if she was all right, and the victim shook her head. *See* Tr.I/184. The petitioner and his roommate left the victim's apartment. *Id.*

After the petitioner left her apartment, the victim called her roommate, Amy Dube, and Ms. Dube arrived at the apartment a short time later. *See* Tr.I/184-85. The victim also called her friend Laura Glica and told her the petitioner dragged her around the apartment and raped her. *See* Tr.II/24.[3] Laura Glica drove from her home in Vermont to the victim's apartment in Chicopee. *See* Tr.II/19-21. Ms. Glica, Ms. Dube and the victim then went to the Chicopee police station, where the victim filed a complaint and gave a brief statement to Officer Matthew Kotowsky. *See* Tr.I/186-194. Photographs were taken of a mark on the victim's buttocks that resembled a handprint. *See* Tr.I/192-194. The victim declined to undergo a rape examination. *See* Tr.II/85-86.

---

[3] Laura Glica testified as the only fresh complaint witness.

7

On June 24, 2000, Officer Holly Davis, a sexual assault investigator with the Chicopee Police Department, visited the victim's apartment and seized numerous items, including a knife with blood on the blade, and took photographs of the scene. *See* Tr.II72, 74. Officer Davis also took a full statement from the victim. *See* Tr.II/197-98. This statement was more detailed than the initial statement she gave to the male officer at the police station. *See* Tr.II/197-98.

### B.    The Petitioner's Case

The petitioner offered the testimony of two witnesses that observed the victim at the petitioner's home on June 16 or 17, 2000. *See* Tr. II/119-20, 138-140, 151-155. The witnesses testified that the victim and the petitioner were affectionate towards each other, and that the victim spent the night in the petitioner's bedroom. *See* Tr. II/121-24, 143. The petitioner's roommate also testified that he had dropped the petitioner off at the victim's apartment on June 19, 2000, and picked him up in the morning hours of June 20, 2000. *See* Tr. II/156-57. The petitioner's roommate did not see anything unusual, and testified that the victim gave the petitioner a hug and a kiss goodbye as he left her apartment. *See* Tr. II/165-66. He did not notice any marks on the victim, nor did he observe any wounds on the petitioner's wrists. *See* Tr. II/167. The petitioner's arms are covered from wrist to shoulder with tattoos. *See* Tr. II/169-70.

### Argument

### I.    Loughman Was Required to Exhaust His State-Court Remedies Before Filing This Petition.

It is well settled that "a federal court will not entertain an application for habeas relief unless the petitioner first has fully exhausted his state remedies in respect to each and every claim contained within the application." *Adelson v. DiPaola*, 131 F.3d 259, 261 (1st Cir. 1997) (*citing*

8

*Rose v. Lundy*, 455 U.S. 509, 518-19 (1982)).  *See also Picard v. Connor*, 404 U.S. 270, 276 (1971); 28 U.S.C. § 2254(b)(1)-(2).  In addition to ensuring that state courts have the first opportunity to correct their own federal constitutional errors, the exhaustion requirement enables federal courts to accord appropriate respect to the sovereignty of the states and thus promotes comity by "minimiz[ing] friction between our federal and state systems of justice...."  *Duckworth v. Serrano*, 454 U.S. 1, 3 (1981).  *See also Rose*, 455 U.S. at 518 (reiterating importance of exhaustion doctrine); *Mele v. Fitchburg District Court*, 850 F.2d 817, 819 (1st Cir. 1988) (same).

To satisfy the exhaustion requirement, the petitioner bears the "heavy burden" of showing that he "fairly presented the substance of his federal habeas claims to the state court before seeking federal review."  *Adelson*, 131 F.2d at 262; *Gagne v. Fair*, 835 F.2d 6, 7 (1st Cir. 1987). It is not enough for the petitioner to set forth the factual basis for his claims; he must also "elucidate the legal foundation of his federal claim" in such a way that its "federal quality" is "readily apparent" to the state court.  *Adelson*, 131 F.2d at 262; *Nadworny v. Fair*, 872 F.2d 1093, 1101 (1st Cir. 1989).  In other words, the federal issue must be presented "face up and squarely" to the "state's highest tribunal."  *Mele,* 850 F.2d at 820, 823 (*quoting Martens v. Shannon*, 836 F.2d 715, 717 (1st Cir. 1988)).

Finally, *every* claim must have been exhausted.  *Rose*, 455 U.S. at 522; *O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999).  If a petition is "mixed" – that is, contains both exhausted and unexhausted claims – it must be dismissed.[4]  *Rose*, 455 U.S. at 522; *Adelson*, 131 F.3d at

---

[4]  Prior to enactment of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), failure to exhaust all claims in state court required dismissal of the entire petition. Under AEDPA, a court confronted with unexhausted claims may, in its discretion, either dismiss the entire petition as unexhausted or deny (but not grant) the petition on the merits.  *See* 28 U.S.C. § 2254(b)(1)-(2) ("[a]n application for a writ of habeas corpus may be *denied* on the

261-62; *Martens*, 836 F.2d at 717-18.  Because ground three is unexhausted, the petition must be dismissed.

### A.    Loughman Presented Ground Three to the SJC Purely as a State Law Claim.

In ground three of the petition, Loughman alleges the "violation of Article six...right to impartial jury." *See* Petition at ¶12C.  The respondent requested a motion for a more definite statement relative to the petitioner's claims for habeas relief and the petitioner filed an excerpt from his ALOFAR.  *See* Docket at 8 and 18.  While it appears that the factual underpinnings of ground three were presented to the state court, petitioner's arguments relative to the erroneous jury instructions below were predicated entirely on Massachusetts law and whether they created a substantial risk of a miscarriage of justice.  *See* RSA, Petitioner ALOFAR at 13-15.  In fact, the petitioner did not object to the instructions at issue.  *Id.*  In challenging the jury instructions, the petitioner did invoke his constitutional right to the effective assistance of counsel, but he did not invoke any federal cases relating to the right to an impartial jury. *Id.*  He did not evaluate any constitutional amendments, advance any constitutional theories, make any constitutional analogies or do anything else to "fairly and recognizably present[] to the state courts ... the legal bases of [a] federal claim." *Adelson*, 131 F.2d at 262.  Indeed, while the petitioner now contends that the jury instruction violated his right to an impartial jury, he made no such argument in

_____

merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State") (emphasis added).  The Court may not, however, dismiss the unexhausted claims and proceed to the merits of the exhausted claims. *See, e.g.*, *O'Sullivan*, 526 U.S. at 842-48 (reviewing exhaustion requirements under AEDPA and concluding that petitioner must properly exhaust his state-court remedies with respect to all claims in the habeas writ; affirming dismissal of petition containing unexhausted claims).

constitutional terms when he was before the SJC.  *See* RSA, Petitioner's ALOFAR.  The issue of

the right to an impartial jury appears nowhere in Loughman's ALOFAR.

Instead, Loughman simply argued that the trial judge's erroneous instructions in response

the declared impasse created a substantial risk of a miscarriage of justice.  *See* RSA, Petitioner

ALOFAR at 13-15.   In so advocating, the petitioner relied on cases that examined jury

instructions in response to a jury's declared impasse under state-law principles.  *See, e.g.*

*Commonwealth v. Roth*, 437 Mass. 777, 791, 776 N.E.2d437 (2002) ("We have previously

recognized  that deadlocked juries are susceptible to coercion."); *Commonwealth v. Connor*, 392

Mass. 838, 844 467 N.E.2d 1340 (1984)("general principle [that utmost caution is required to

avoid invading the province of the jury] has been stressed in cases dealing with wording of

supplementary instructions to a deadlocked jury."); *Commonwealth v. Rodriguez*, 364 Mass. 87,

99, 300 N.E.2d 192 (1973)(misstatement in standard *Tuey*[5] charge needed to be corrected "even

if it is a slight one" due to "a tendency toward coercions.").   Although the Massachusetts cases

cited by the petitioner in his ALOFAR cite to federal cases, *see e.g. Commonwealth v. Rodriguez*,

364 Mass. 87, 98, 300 N.E. 2d 192, FN 13, citing *Allen v. United States*, 164 U.S. 492, 501

(1896), Loughman merely argued that the trial judge's erroneous instructions in response the

declared impasse created a substantial risk of a miscarriage of justice.  *See* RSA, Petitioner

ALOFAR at 13-15.  Although the petitioner argued that his counsel was constitutionally

ineffective for failing to object to the jury instruction, the jury instruction claim itself did not rely

on a federal "right to an impartial jury."  *Cf*. Petition at ¶ 12(C) and ALOFAR at  pp.12-15.

---

[5]  "Tuey" refers to the case *Commonwealth v. Tuey*, 8 Cush.1 2-3 (1851).

Simply put, the petitioner's arguments to the SJC contained none of the "trappings" generally associated with a federal claim, such as

> specific constitutional language, constitutional citation, appropriate federal precedent, substantive constitutional analogy, argument with no masking state-law character and the like – [that] would in all likelihood alert a reasonable jurist to the existence of a federal question.

*Nadworny*, 872 F.2d at 110.   Because the federal nature of this claim was not presented to the SJC "squarely and face up" – indeed, were not presented at all – the petitioner failed to exhaust his state-court remedies with respect to ground three.  *Martens*, 836 F.2d at 717.

Where as here, the court is presented with a mixed petition, it generally must dismiss the entire petition unless the petitioner elects to voluntarily delete the unexhausted claim and proceed only with the claims that have been properly exhausted.  *See Rose*, 455 U.S. at 520-522. But this Court is permitted to reach the merits of a petitioner's claim if it denies the entire petition on the merits.  28 U.S.C. § 2254 (b)(2)("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies in the courts of the State.").   Since ground three lacks merit, the respondent respectfully requests that the Court reach the merits to deny it, as well as the remaining claims.

## II.    The Petitioner's Jury Instruction Claim Relative to the Fresh Complaint Evidence Is Procedurally Defaulted And He Has Failed To Establish Cause And Prejudice Or That A Miscarriage Of Justice Will Result If The Claim Is Not Reviewed.

"The habeas corpus anodyne is designed neither to provide an additional layer of conventional appellate review nor to correct garden-variety errors, whether of fact or law, that may stain the record of a state criminal trial.  Rather, the remedy is limited to the consideration of federal constitutional claims."  *Burks v. DuBois*, 55 F.3d 712, 715 (1st Cir. 1995).  *See Herrera*

*v. Collins*, 506 U. S. 390, 400 (1993) (affirming that the purpose of federal habeas corpus review is to ensure that individuals are not imprisoned in violation of the Constitution). *See also Barefoot v. Estelle*, 463 U. S. 880, 887 (1983) ("Federal courts are not forums in which to relitigate state trials"). Thus, federal habeas review is precluded, as a general proposition, when a state court has reached its decision on the basis of an adequate and independent state-law ground. *See Coleman v. Thompson*, 501 U. S. 722 (1991). In *Coleman*, the Supreme Court held that where

> a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claim is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.

*Id*. at 750. *See Lynch v. Ficco*, 438 F. 3d 35, 45 (1st Cir. 2006); *Horton v. Allen,* 370 F. 3d 75, 80 (1st Cir. 2004). A petitioner's procedural default constitutes an adequate and independent state ground so long as the state consistently applies the rule and has not waived it. *Horton v. Allen,* 370 F.3d at 80-81; *Gunter v. Maloney*, 291 F.3d 74,79 (1st Cir. 2002); *Burks v. DuBois*, 55 F.3d at 716; *Puleio v. Vose*, 830 F.2d 1197, 1199 (1st Cir. 1987), *cert. denied*, 485 U. S. 990 (1988). The jurisdictional nature of the independent and adequate state ground inquiry requires that it be addressed by this Court at the outset. *Lambrix v. Singletary*, 520 U. S. 518, 523-24 (1997).

Because the petitioner's claim relative to jury instruction concerning fresh complaint evidence was raised for the first time on appeal, without objection in the trial court, the Appeals Court reviewed it only to determine whether the jury instruction "created a substantial likelihood of a miscarriage of justice." *See Commonwealth v. Loughman,* 61 Mass. App. Ct. 1114, 810

N.E.2d 1289.   Massachusetts has "a long standing rule that issues not raised at trial...are treated as waived..." *Commonwealth v. Curtis*, 417 Mass. 691, 626, 632 N.E.2d 821, 827 (1994).  The rationale behind the waiver doctrine is that a defendant who fails to bring his claim to the attention of the reviewing court at the earliest possible time, waives his right to the court's resolution of that claim.  *See Lykus v. Commonwealth*, 432 Mass. 160, 163, 732 N.E.2d 897, 900 (2000), *quoting Commonwealth v.  Pisa*, 384 Mass. 362, 365-366, 425 N.E.2d 290, 293 (1981). In Massachusetts, appellate review of waived claims is limited to the discretionary standard of whether the claimed transgression created a substantial risk of a miscarriage of justice.  *See Horton v. Allen,* 370 F.3d at 80; *Burks v. Dubois*, 55 F.3d at 716; *Puleio v. Vose*, 830 F. 2d at 1199.  Here, the Appeals Court reviewed this procedurally barred claim under that standard.  *See Commonwealth v. Loughman,* 61 Mass. App. Ct. 1114, 810 N.E.2d 1289.  The Appeals Court concluded that judge did not "comment on the evidence" so as to "convey his own view of where the weight of the evidence lies."  *Id.*, *citing  Commonwealth v. Kane*, 19 Mass. App. Ct. 129, 138, 472 N.E2d 1343 (1984).  Thus, the Appeals Court held that the judge's fresh complaint instructions did not create a substantial likelihood of a miscarriage of justice.  *Commonwealth v. Loughman,* 61 Mass. App. Ct. 1114, 810 N.E.2d 1289.  This limited review undertaken pursuant to the Massachusetts "miscarriage of justice" standard does not operate as a waiver of the underlying procedural default. *Burks*, 55 F.3d at 716 n. 2.

To the contrary, such review constitutes the "classic example of an independent and adequate state ground" supporting the application of the procedural default rule.  *Simpson  v. Matesanz*, 175 F.3d 200, 207 (1st. Cir. 1999).  Since the Appeals Court  resolved petitioner's jury instruction claim relative to fresh complaint on state law grounds, this habeas court may consider

14

the claim only if the petitioner establishes "cause and prejudice" with respect to the procedural default or demonstrates to this Court his actual innocence. *See Dretke v. Haley*, 541 U.S. 386, 388 (2004). The petitioner has made no attempt to show "cause," "prejudice," or a miscarriage of justice to excuse the default, nor could he. Here, the fact that petitioner does not even attempt to demonstrate cause for his procedural default effectively ends the inquiry for this Court.

Absent cause and prejudice sufficient to excuse his procedural default, the only other avenue available to the petitioner – that a refusal to hear his defaulted claim relative to the trial judge's jury instruction on identity – would result in a "fundamental miscarriage of justice" – is foreclosed. *Simpson v. Matesanz*, 175 F.3d at 210. This exception to the procedural default rule is "'seldom to be used, and explicitly tied to a showing of actual innocence.'" *Killela v. Hall*, 84 F. Supp. 2d 204, 210 (D. Mass. 2000) (*quoting Burks*, 55 F.3d at 717). No such showing has been or could be made here; thus petitioner's default cannot be excused and this claim must be denied.

III. **The Habeas Petition Should Be Denied Where the Petitioner's Ineffective Assistance of Counsel Claim and Closing Argument Claim Were Properly Adjudicated by the Massachusetts Appeals Court Which Did Not Render A Decision That Was Contrary To, Or An Unreasonable Application of, Clearly Established Federal Law.**

A. **The Standard of Review.**

"Under the AEDPA, a state prisoner can prevail only if the state court's decision `was contrary to, or involved an unreasonable application, of clearly established Federal law, as determined by the Supreme Court of the United States.'" *Tyler v. Cain*, 533 U.S. 656, 660 (2001) (*quoting* 28 U.S.C. § 2254(d)(1)). A state-court decision is "contrary to" clearly established Supreme Court precedent in only two circumstances: (a) where "the state court

15

applies a rule that contradicts the governing law set forth in" Supreme Court cases or (b) where "the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [Supreme Court] precedent." *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000).

A state-court decision involves an "unreasonable application" of Supreme Court precedent "if the state court identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case." *Id.* at 407-09, 413. Merely that the state court reached an incorrect result is not sufficient – the result also must be unreasonable. *L'Abbe v. DiPaolo*, 311 F.3d 93, 96 (1st Cir. 2002) (*citing Taylor*, 529 U.S. at 411); *see also McCambridge v. Hall*, 303 F.3d 24, 36-37 (1st Cir. 2002) (en banc) ("'some increment of incorrectness beyond error is required'. . . . The increment need not necessarily be great, but it must be great enough to make the decision unreasonable in the independent and objective judgment of the federal court," *quoting Francis S. v. Stone*, 221 F.3d 100, 111 (2d Cir. 2000)). Where, for instance, the state court reaches a result that is "devoid of record support for its conclusion or is arbitrary," the unreasonable application prong likely will be satisfied. *McCambridge*, 303 F.3d at 37 (*citing O'Brien v. Dubois*, 145 F.3d 16, 25 (1st Cir. 1998)). However, "a state court need not cite or be aware of Supreme Court precedents so long as 'neither the reasoning nor the result of the state-court decision contradicts them.'" *Knight v. Spencer*, 447 F.3d 6, 12 (1st Cir. 2006), quoting *Early v. Packer*, 537 U.S. 3, 8 (2002).

In some habeas cases, resolution of petitioner's claims will turn entirely on the state court's determination of the underlying factual issues. *DiBenedetto v. Hall*, 272 F.3d 1, 7 n.1 (1st Cir. 2001), *cert. denied*, 535 U.S. 1024 (2002). This is because, under the AEDPA, state

16

court factual determinations are "presumed to be correct," unless the petitioner rebuts this

"presumption of correctness" by coming forward with "clear and convincing evidence" to the

contrary.  28 U.S.C. § 2254(e)(1); *Coombs v. Maine*, 202 F.3d 14, 18 (1st Cir. 2000).  The

presumption of correctness applies to all "basic, primary, or historical facts" underlying the state

court's conclusion,  *Sanna v. DiPaolo*, 265 F.3d 1, 7 (1st Cir. 2001);  *see also Thompson v.*

*Keohane*, 516 U.S. 99, 111-13 (1995) (for purpose of *Miranda*, scene-setting factual findings

involving the trial court's assessment of credibility, are presumed to be correct), and extends to

factual determinations made by both state trial and appellate courts.  *Rashad v. Walsh*, 300 F.3d

27, 34 (1st Cir. 2002), *cert. denied*,  537 U.S. 1236 (2003).

### A.    The Petitioner Received the Effective Assistance of Counsel.

In *Williams v. Taylor*, 529 U.S. at 390-391, the Supreme Court held that *Strickland v.*

*Washington*, 466 U.S. 668 (1984) was the clearly established federal law that controlled claims

related to ineffective assistance of counsel.  Thus, a petitioner alleging ineffective assistance of

counsel must establish two elements in state court in order to prevail:

> First, the [petitioner] must show that counsel's performance was
> deficient.  This requires showing that counsel made errors so serious
> that counsel was not functioning as the "counsel" guaranteed the
> [petitioner] by the Sixth Amendment.  Second, the [petitioner] must
> show that the deficient performance prejudiced the defense.

*Ouber v. Guarino*, 293 F.3d 19, 25 (1st Cir. 2002), *citing Strickland*, 466 U.S. at 687.

In state court, the petitioner bore the heavy burden of proving ineffective assistance,

*Scarpa v. DuBois*, 38 F.3d 1, 8-9 (1st Cir. 1994), *cert. denied*, 513 U.S. 1129 (1995); *Lema v.*

*United States*, 987 F.2d 48, 51 (1st Cir. 1993), which required the two-part analysis articulated

above.  First, "'judicial scrutiny of counsel's performance must be highly deferential.'" *Ouber v.*

*Guarino*, 293 F.3d at 25, *citing Strickland*, 466 U.S. at 689.  Furthermore, the reviewing court must not lean too heavily on hindsight: a lawyer's acts and omissions must be judged on the basis of what he knew, or should have known, at the time his tactical choices were made and implemented.  *Id., citing Bell v. Cone*, 535 U.S. 685, 696 (2002); *United States v. Natanel*, 938 F.2d 302, 309 (1st Cir. 1991), *cert. denied*, 502 U.S. 1079 (1992).  Only if, "in light of all the circumstances, the [alleged] acts or omissions of counsel were outside the wide range of professionally competent assistance," can a finding of deficient performance ensue.  *Ouber  v. Guarino*, 293 F.3d at 25, *quoting Strickland*, 466 U.S. at 690.  In fact, "'the proper measure of attorney performance remains simply reasonableness under prevailing  professional norms.'"  *Lynch v. Ficco*, 438 F.3d 35, 49 (1st Cir. 2006), quoting *Wiggins v. Smith*, 539 U.S. 510, 521 (2003)(quoting *Strickland*, 466 U.S. at 688)(internal quotation marks omitted).

Secondly, even if a lawyer's performance is constitutionally unacceptable, relief will be withheld unless the petitioner demonstrates that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Ouber v. Guarino*, 293 F.3d at 26,  *quoting Strickland*, 466 U.S. at 694.  While this level of prejudice may be presumed in a few settings, that is the exception, not the rule.  *Id*. (citing *Strickland*, 466 U.S. at 694).  Indeed, the petitioner must demonstrate that he was prejudiced, *i.e.*, that his attorney's parlous conduct may have altered the outcome of the case.  *Id*. (citing *Smith v. Robbins*, 528 U.S. 259, 285-86 (2000)).  Although the possibility of a different outcome must be substantial in order to establish prejudice, it may be less than fifty percent.  *Id*.(citing *Strickland*, 466 U.S. at 693 (explaining that "a [petitioner] need not show that counsel's deficient conduct more likely than not altered the outcome in the case")).

The petitioner asserts that he was denied the effective assistance of counsel because counsel failed to object to "said jury instructions." *See* Petition at ¶12 (A).  Although the petition does not specify which instructions his counsel failed to object to, in his *pro se* more definite statement, petitioner claims that counsel was ineffective for failing to object to both the jury instructions in response to the jury's declared impasse and the trial judge's fresh complaint instructions.  *See* Pro Se More Definite Statement at p. 4 and p. 8.  In its review of the record, the Appeals Court  reasonably rejected both of the petitioner's ineffective assistance of counsel claims.  *See Commonwealth v. Loughman,* 61 Mass. App. Ct. 1114, 810 N.E.2d 1289. In rejecting the ineffective assistance of counsel claim as to the jury impasse instruction and the fresh complaint instructions, the Appeals Court simply explained that because the instructions were not erroneous, the ineffective assistance of counsel claim must fail.  *See Commonwealth v. Loughman,* 61 Mass. App. Ct. 1114, 810 N.E.2d 1289.

It is of no consequence that the Appeals Court did not explicitly mention *Strickland* where it applied the Massachusetts' enunciation of the ineffective standard derived from *Commonwealth v. Saferian*, 366 Mass. 89, 315 N.E. 878 (1974).  As the First Circuit has affirmed, *Saferian* is the functional equivalent of *Strickland*.  *See Ouber  v. Guarino*, 293 F.3d at 44, citing *Scarpa*, 38 F.3d at 7-8.  Since the Appeals Court identified and articulated the substance of the *Strickland* standard, and was not presented with facts that were materially indistinguishable from those at issue in *Strickland*,  the "contrary to" portion of the analysis drops from the equation.  *See Williams v. Taylor*, 529 U.S. at 406 ("a run-of-the mill state-court decision applying the correct legal rule from our cases to the facts of the prisoner's case would not fit comfortably within § 2254(d)(1)'s 'contrary to' clause").  In other words, *Strickland* and

its progeny do not require an outcome "contrary to" that reached by the Appeals Court.

Additionally, the record supports the Appeals Court's conclusion that the jury instructions were not erroneous. For instance, concerning the jury impasse instruction, the trial judge instructed the jury as follows:

> it would be the preference of the court, if possible, to receive verdicts on all three counts at the same time. So I will not take the verdicts on counts one and three now. Instead, I will address myself to the second part of your note; namely, you say you've reached an impasse on count two. Let me give you an instruction concerning that fact.

Tr.III/10-11. The trial judge then properly instructed the jury, pursuant to the model jury instruction approved in *Commonwealth v. Rodriguez*, 364 Mass. 87, 101-02, 300 N.E. 2d 192 (1973).

A review of the record also demonstrates that the fresh complaint instruction was correct. The trial judge stated:

> If you decide that the alleged statements were made by the alleged victim to this witness and they're made reasonably promptly and voluntarily, you may consider them...only as evidence of corroboration of the alleged victim's testimony here in court and not as proof that a sexual assault actually occurred.

Tr. II/33, 239. The instruction clearly informed the jury that it was required to decide whether or not the victim made the statement to the fresh complaint witness. Accordingly, the petitioner cannot demonstrate that the decision of the Massachusetts Appeals Court unreasonably applied *Strickland*. Habeas relief should be denied.

**B**.     **The Prosecutor's Reference to the Petitioner's Tattoos.**

Loughman also claims prosecutorial misconduct concerning his tattoos. *See* Petition at ¶12 (B). A review of the Appeals Court's decision demonstrates that it was neither contrary to, nor

an unreasonable application of clearly established Supreme Court law.  The Appeals Court  held:

> The [petitioner] asserts that the prosecutor improperly portrayed the [petitioner]'s
> tattoos as an indicator of bad character. (FN2)[6] We disagree. The victim testified that
> during the assault, the [petitioner] twice attempted to cut his wrists, and she said that
> she observed some blood on his skin. The [petitioner]'s roommate testified that he did
> not notice any marks or blood on the [petitioner]'s wrists. On cross-examination, the
> roommate acknowledged that the [petitioner] had extensive tattoos on his arms. In
> closing, defense counsel attempted to cast doubt on the victim's testimony regarding
> the suicide attempt, and generally undermine her credibility. The prosecutor, in
> summation, reiterated that the "[petitioner] had tattoos up and down his arms,"
> apparently to suggest that superficial cuts may have gone unnoticed by the
> [petitioner]'s roommate. (Tr. 2:214) We agree with the Commonwealth that the
> prosecutor's comments were supported by the evidence and were "reasonably within
> the prosecutor's right of retaliatory reply." *Commonwealth v. LaFave*, 407 Mass. 927,
> 939 (1990), quoting from *Commonwealth v. Prendergast*, 385 Mass. 625, 633 (1982)
> (prosecution fairly responded to defense's closing argument which attacked victim's
> credibility). Furthermore, the judge instructed the jury that closing arguments were not
> evidence. Finally, the jury convicted on one count of rape and acquitted on the other,
> indicating a deliberate consideration of the evidence.

*Commonwealth v. Loughman,* 61 Mass. App. Ct. 1114, 810 N.E.2d 1289.  The Appeals Court's

conclusion that the prosecutor's  comments were supported by the evidence  and were

"reasonably within the prosecutor's right of retaliatory reply,"  is entirely consistent with clearly

established Supreme Court precedent.  Where, as here, a defendant alleges that a prosecutor used

improper comments to secure a conviction, the "relevant question is whether the prosecutor's

comments 'so infected the trial with unfairness as to make the resulting conviction a denial of

due process.'"  *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (*quoting Donnelly v.*

*DeChristoforo*, 416 U.S. 637, 643 (1974)).  In making this determination, the Supreme Court has

cautioned that courts must be careful not to view the prosecutor's comments in artificial

---

[6]  In footnote two, the Appeals Court stated, "The [petitioner] argues that the
Commonwealth "in essence told the jury to convict [him] because his unusual appearance
purportedly indicated guilt." We emphasize that the Commonwealth's request to have the
[petitioner] show the jury his arms was denied."

isolation, but rather must view those comments in the context of the entire proceeding to determine whether the prosecutor's comments so affected the fairness of the defendant's trial that a new trial is warranted. *United States v. Young*, 470 U.S. 1, 1-12 (1985). In making this determination, the First Circuit has stated that courts should consider several factors, including "'(1) the severity of the misconduct; (2) the context in which it occurred; (3) whether the judge gave any curative instructions and the likely effect of such instructions; and (4) the strength of the evidence against the defendant.'" *United States v. Derman*, 211 F.3d 175, 179, n.5 (*quoting United States v. Rodriquez-De Jesus*, 202 F.3d 482, 485 (1st Cir. 2000)); *see also United States v. Glantz*, 810 F.2d 316, 319 (1st Cir.) (relying on same factors in reversing district court's grant of new trial based on prosecutorial misconduct in closing argument), *cert. denied*, 482 U.S. 929 (1987). Where the Appeals Court identified and articulated the substance of the *Darden v. Wainwright* standard, the contrary to portion of the analysis drops from the equation. *See Williams v. Taylor*, 529 U.S. at 406 ("a run-of-the-mill state-court decision applying the correct legal rule from our cases to the facts of the prisoner's case would not fit comfortably within §2254(d)(1)'s 'contrary to' clause"). Thus, *Darden v. Wainwright* does not require an outcome "contrary to" that reached by the Appeals Court.

Further, the Appeals Court objectively and reasonably determined that, viewed in the proper context of the entire trial, the prosecutor's challenged comments were firmly grounded in the evidence and simply responded to the defense counsel's attack on the victim's credibility. *See Commonwealth v. Loughman,* 61 Mass. App. Ct. 1114, 810 N.E.2d 1289. Furthermore, the Appeals Court noted that the judge instructed the jury that closing arguments were not evidence. *Id*. Lastly, the Appeals Court noted that the jury convicted on one count of rape and acquitted on the other, demonstrating a deliberate consideration of the evidence. *Id*. Habeas relief should be denied.

22

## Conclusion

For the foregoing reasons, the respondent respectfully requests that the Court deny

Loughman's petition for a writ of habeas corpus.

Respectfully submitted,

MARTHA COAKLEY
ATTORNEY GENERAL

/s/ Eva M. Badway
Eva M. Badway
Assistant Attorney General
Criminal Bureau
One Ashburton Place
Boston, Massachusetts
(617) 727-2200, ext. 2824
Dated: March 22, 2007                    BBO # 635431

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically
to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper
copies will be sent to those indicated as non-registered participants on March 22, 2007.

/s/ Eva M. Badway
Eva M. Badway